Olimpio Lee Squitieri
SQUITIERI & FEARON, LLP
2600 Kennedy Boulevard
Suite 1K
Jersey City, New Jersey 07306
Tel: (201) 200-0900
Fax: (201) 200-9008

        - and -

32 East 57th Street
12th Floor
New York, New York 10022
Tel: (212) 421-6492
Fax: (212) 421-6553

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **RADUL RADOVICH, SILVER MOUNTAIN PROMOTIONS, INC., ST. PETKA TRUST and R AND R HOLDINGS,** | **Civil Action No.:** |
| **Plaintiffs,** | **COMPLAINT** |
| **vs.** | **JURY TRIAL DEMANDED** |
| **YA GLOBAL INVESTMENTS, L.P., a Delaware limited partnership, formerly known as CORNELL CAPITAL PARTNERS, LP; YORKVILLE ADVISORS, LLC, a Delaware limited liability company; YORKVILLE ADVISORS GP, LLC; MARK ANGELO; DAVID GONZALEZ; and CRAIG ENGLER,** | |
| **Defendants.** | |

Plaintiffs hereby respectfully complain and allege as follows upon their own knowledge as to their own transactions and upon information and belief as to all other matters based upon investigation of counsel of public records and other information.

## I.

## JURISDICTION AND VENUE

1. Plaintiffs are all citizens and residents of the State of California.

2. Defendants are all residents of the State of New Jersey with the entity Defendants maintaining their respective principle places of business in New Jersey.

3. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that all parties Plaintiffs and Defendants are residents of different states.

4. Venue is proper in this district pursuant to 28 U.S.C. § 1331 in that all Defendants reside and/or conduct substantial business in this State and many of the acts and omissions forming the basis of this suit occurred in this State.

## II.

## PARTIES

5. Plaintiffs are natural persons and entities who were defrauded by the misrepresentations, acts and omissions of the Defendants in late 2006 through August 2007.

(a) Plaintiff Silver Mountain Promotions, Inc. ("Silver Mountain") is a corporation organized and existing under the laws of the State of California with its principle place of business in California.

(b) Plaintiff St. Petka Trust ("Trust") is a trust created under the laws of the State of California with its principle place of business in California.

2

(c)     Plaintiff R and R Holdings ("Holdings") is a corporation created under the laws of the State of California.

(d)     Plaintiff Radul Radovich was at all relevant time the President of Silver Mountain; the trustee of the Trust; and the President of Holdings.

6.     Defendant, YA Global Investments, L.P. ("YAGI") is a limited partnership which was organized and existing under the laws of the State of Delaware, but which redomicled in Cayman Islands with its principal office in the State of New Jersey.  The Individual Defendants are the principles and owners of YAGI.  YAGI is the successor in interest to Cornell Capital Partners, LP ("Cornell").

7.     Defendant Yorkville Advisers GP, LLC ("YAGI GP") was at all relevant times the general partner of YAGI and managed YAGI and controlled its actions.

8.     Defendant, Yorkville Advisors, LLC ("Yorkville"), a Delaware limited liability company is owned and controlled by the Individual Defendants which purported to act as a financial adviser for the financing clients of YAGI, including in this case, the Plaintiffs.

9.     Defendant, Mark Angelo ("Angelo"), was at all relevant times founder, president and majority owner of YAGI, Yorkville and YAGI, GP.

10.     Defendant, David Gonzalez ("Gonzalez"), was at all relevant times an executive officer of YAGI and Yorkville..

11.     Defendant, Craig Engler ("Engler"), was at all relevant times a managing director of YAGI.

12.     The entity Defendants and Angelo are now subject of a civil action by the SEC. A copy of the complaint is attached.

3

13.     Plaintiffs are informed and believe and based thereon allege that at all times mentioned herein each of the Defendants were and now are the agent, servant, employee, co-conspirator, representative and alter ego of each of the remaining Defendants and, in doing the things hereinafter alleged were acting within the scope of their authority as such agent, servant, employee, co-conspirator, representative and alter ego, with the knowledge, permission, consent and ratification of the remaining Defendants.

## III.
## SUBSTANTIVE ALLEGATIONS

### A.     Introduction

14.     Defendant Yorkville Global Investors LP (hereinafter "YAGI"), formerly known as Cornell Capital, holds itself out to the public as an investment firm and is one of the most active hedge funds in financing for public companies using a technique known as Private Investment in Public Equities ("PIPE"), and has entered into over 350 transactions with publicly traded companies since 2001. PIPEs are of two types. A traditional PIPE is a purchase of securities in a company allowing the holder of such securities to purchase the common stock of the issuer at market value or at a discount to the then current market value per share. In a traditional PIPE, the stock is issued by a publicly traded company at a price determined at the time the PIPE deal is made. That type of PIPE, makes its profitable for the PIPE leader to short the stock only when the stock price has increased.

15.     Plaintiffs were long time investors in Cobalis Corporation and invested large sums of money in Cobalis through the purchase of Cobalis' debt securities. To support Cobalis through its development stages, prior to 2006, Plaintiffs converted their debt to equity in Cobalis in order to allow Cobalis to improve its balance sheet position to facilitate raising additional

capital.  In 2006, Cobalis was seeking sources of financing to fund the testing of PreHistin® to obtain FDA approval.  This search for financing led Plaintiffs to Defendants in mid 2006.

16.     In mid 2006, Chas Radovich, son of Plaintiff Radul Radovich began negotiations with Defendants for financing for Cobalis.  In that capacity, Chas Radovich was at all times acting as agent for the Plaintiffs.  Such agency was known to all Defendants.

**B.     The Structure PIPE Financing Vehicle**

17.     In a "structured" PIPE, the first step is private placement of debt securities or debentures that are convertible into common stock at a conversion price that automatically adjusts downward if the borrower's share price falls. These structured PIPEs have been colloquially dubbed "toxic" or "death-spiral" convertibles because the purchaser of PIPE convertible debentures has a strong incentive for short selling to lock in the sale price of the company's stock. The short position may be covered by converting shares in the debentures. This selling creates downward pressure on the borrower's stock, which benefits the debenture holder-lender by allowing it to obtain more shares through conversion shares at depressed prices. Indeed, there is usually no limit on the downward adjustment of the conversion price.  The prospect of large-scale conversions and sales at declining prices can create selling pressure which pushes the borrower's share price downward, thus requiring the borrower to issue ever more shares.

18.     The structured PIPE gives YAGI enormous potential to profit when its client's (the borrower's) stock price declines while at the same time giving YAGI enormous power to cause stock price declines in the borrower's stock.   Accordingly, a borrower or other counterparty involved in a structured PIPE transaction will seek the strongest possible assurances and representations that a structured PIP lender will not sell, or sell short, the shares of a

borrower or loan shares of the borrower to short sellers. YAGI, in a position to obtain Cobalis stock at will by virtue of the structured PIPE provisions, could lock in profits through short sales of Cobalis stock. Ethical and honest PIPE lenders will not abuse the trust and confidence of their borrowers or their power and control of a significant block of the borrower's equity for their own profit. Defendants were not ethical or honest PIPE lenders.

19.     Unbeknownst to Plaintiff, Defendants were and have been frequent abusers of structured PIPEs to the detriment of their clients. From 2001 through 2008, YAGI invested in 358 deals/transactions using PIPEs. Over that period of time, YAGI either invested or made commitments of $4.353 billion which resulted in the following: (2) more than 75% (271 out of 358 of the clients) are either bankrupt, not trading, worthless, or trading at less than $0.01 per share; (ii) more than 96% (344 out of 358) have a lower stock price since YAGI's date of investment; (iii) 90% do not have a stock price that is in excess of $0.10 (only 36 out of 358 have a stock price of at least $.010 per share); (iv) only 10% have (37 out of 358) have a stock price more than $0.01 per share but more than $0.10 per share. Nor did Plaintiffs know that the bulk of the entity Defendants' revenue was ("earned") through the sale and short sale of securities of its borrowers.

20.     The structured PIPE which Defendants provided had a built-in incentive to Cornell to short Cobalis' stock because the number of shares of common stock which Cornell could exchange for its debentures increased proportionately with a decrease in the price of Cobalis' common stock.

21.     Defendants knew that Cobalis' stock could be manipulated in the market if a would-be manipulation had access to a significant block of Cobalis stock and if the manipulation could suppress the supply of Cobalis stock, thus creating artificial illiquidity. In 2006, Cobalis'

common stock was a thinly traded over the counter bulletin board stock, (OTCBB), in which bid and ask prices were set by brokerage firms acting as market makers.  The average number of shares of Cobalis' stock traded each day was in the tens of thousands whereas YAGI, was entitled to convert debentures and exercise warrants collectively totaling in excess of ten million.

C.   **Plaintiffs Are Induced To Enter Into Contracts**
**With Defendants Through Fraudulent Statements And Promises**

22.   After several months of negotiations, meetings and drafting of documents, on or about December 20, 2006, Cobalis entered into a structured PIPE transaction.

23.   Prior to entering into the lending agreement, Plaintiffs sought and received assurances and explanations from Defendants as to how Defendants would manage the relationship and what YAGI would and would not do with respect to Cobalis.  As part of the lending transaction, Defendants, through Defendant Yorkville Advisers provided advisory services to Plaintiffs both before and after the closing of the financing transaction at issue herein.

24.   Defendants insisted upon, and obtained, for YAGI a 'lock up' agreement of Plaintiffs' shares, and received an Asset Pledge Agreement for the Plaintiffs' shares as additional collateral for the transaction with Cobalis.   Those instruments provided Defendants with effective 'control' over a dominant and controlling block of Cobalis' common stock. Defendants' power to control that block of equity imposed upon them a fiduciary duty not to misuse or abuse that power nor to elevate and purse their own interests at the expense of the Plaintiffs' interests.

25.   Cornell also insisted upon, and obtained from Cobalis, a reserve of 15,400,000 shares held in escrow, which later could be increased under the Convertible Debentures and Warrants, as set forth in the Pledge and Escrow Agreement, and Irrevocable Transfer Agent Instructions.

26.     It is for the reasons referred to above that Plaintiffs extracted firm promises and representations that Defendants would not engage in transactions that would have the effect or potential to depress the price of Cobalis stock or otherwise adversely affect Cobalis' financial conditions.

27.     Plaintiffs and Cobalis were aware of YAGI's power and potential control over Cobalis' common stock. Plaintiffs repeatedly expressed their concerns to Defendants about Defendants engaging in "death spirals" with companies such as Cobalis.  During the negotiation process, Plaintiffs received oral assurances from Defendants that (1) YAGI was entering into the transaction to profit from Cobalis' long-term success; (2) that YAGI would not engage in transactions that were designed to, or would have the affect of putting downward pressure on Cobalis stock; (3) that YAGI would allow Plaintiffs and Cobalis an opportunity to prevent issuance of Cobalis stock to YAGI by redeeming the debentures before they were converted; (4) that YAGI would hold Cobalis stock with an investment purpose; (5) that YAGI would not interfere, impede, prohibit or discourage Cobalis from raising funding to replace YAGI's financing; (6) that YAGI would not interfere or impede any equity issuance or other capital raise by Cobalis; (7) that in the event YAGI sought to exit its investment in Cobalis stock it would do so in an orderly fashion by liquidating at a rate of not more than 10-20% of the trading volume in a week; (8) that Defendants would be "partnering" with the Plaintiffs; (9) the Defendants would not "short the stock"; (10) that Defendants would not "crush the stock" of Cobalis; (11) that Defendants would not conduct any "indirect" sales of Cobalis common stock; and (12) the Defendants had no interest in monetizing the stock of Cobalis in the absence of an increase in the stock price.

28.     The foregoing representations were made during telephone calls and in-person meetings between and among Cobalis, Chas Radovich, Defendants and Plaintiffs.

29.     To reinforce those promises, Plaintiffs bargained for provisions in the Transaction Documents which prohibited Defendants from engaging in short sales.  The intent of the parties in using the term "short sales" was to refer to a practice of selling a security without concurrent possession of a  physical certificate bearing a serial number.  The parties were aware of SEC Regulation SHO which has an exception for sales that would otherwise be short sales.  The exception applies to sellers who own debentures that can be converted into share certificates with serial numbers. The parties deliberately chose not to refer to Regulation SHO because it was their intent that Defendants could not sell Cobalis shares unless and until share certificates bearing serial numbers were in their hands.  To further limit downward selling pressure on Cobalis stock, Plaintiffs insisted on limiting YAGI's ownership to no more than 4.99% of Cobalis' issued shares at any one point in time, and obligated Defendants to hold their block of Cobalis common stock accumulated under the PIPE Transaction as an investment, with an investment purpose, and not as a trader attempting to benefit from short term swings in price caused by or contributed to by concentrated trading activities of Defendants directly or indirectly in a short period of time.

30.     In communications between Plaintiffs' representative, Chas Radovich, and officers of YAGI, David Andresen and Craig Engler, it was represented by Engler to Chas Radovich that in the event YAGI sought to exit its position in Cobalis stock, it would do so in an orderly manner, at a rate of no more than 10 – 20% of the weekly trading volume, or roughly 10,000 – 25,000 shares per week.

31.     Initially, Plaintiffs did not want to pledge their shares as security for the Cobalis YAGI financing transaction but Defendants insisted and refused to complete the financing without such agreements from Plaintiffs. To induce Plaintiffs to pledge their shares, Defendants made the representations described herein but had no intent of honoring those representations. In other words, Defendants fraudulently induced Plaintiffs to enter into the asset pledge agreement. The Radovich family shares so pledged were being held at YAGI's offices in New Jersey, and the appointed escrow agent is David Gonzalez, Esq., who is also YAGI's chief legal counsel.

32.     As an adviser to Cobalis and Plaintiffs', Defendants were fiduciaries. Plaintiffs shared confidential information about their stock positions and Cobalis with Defendants.

33.     Defendant YAGI's potential control over the stock of Cobalis was increased by the issuance to it of four classes of warrants issued enabling YAGI to purchase, at its discretion, up to 6,640,602 shares of common stock at pre-set market prices between $0.72 and $0.9955. The desire of Defendants to own these warrants further convinced Plaintiffs that the interests of Defendants and Plaintiffs in the long-term future of Cobalis were aligned.

34.     While Chas Radovich was considering the Transaction Documents prepared and tendered by YAGI, and *before* these documents were executed, Radovich sought and obtained multiple blanket oral confirmations from YAGI's Craig Engler and David Andresen that YAGI would *not* under *any* circumstances *sell* shares of Cobalis short or sell aggressively into the market, during the 2 year term of the Convertible Debentures. This included sales of converted, unrestricted shares; short sales of convertible shares; or, short sales of restricted stock. This agreement was an explicit representation to Plaintiffs meant to induce them to allow YAGI to lock up their shares.

35.     YAGI's principals, Mark Angelo and David Gonzalez, directed Engler and Andresen to make oral assurances to Radovich and Plaintiffs (collectively the "Oral Representations") that:

• YAGI had done similar transactions with over a hundred entities and that YAGI had never sold short any shares of any of those entities;

• YAGI was a long term investor and would not sell the stock in the near future;

• YAGI had not sold short any shares of Cobalis, at any time, and would not engage in any hedging activities;

• Cobalis could trust YAGI and treat it as a financial partner;

• In the event that Cobalis' product trials were not successful, YAGI would wait for Cobalis to go back into the financial markets to pay back the Debentures;

• YAGI would never aggressively sell stock in the market so as to not hurt the share price or "crush and stock"; and,

• YAGI would never sell Cobalis stock in the short-term, hedge, short the stock, or do anything that would diminish the ability of Cobalis to perform its contract with YAGI.

36.     Pursuant to the PIPE, Cobalis agreed to issue YAGI secured convertible debentures in a private placement offering, followed by a registration of Cobalis common stock. YAGI could convert its debentures based on a 10% discount from the lowest volume-weighted average share price (VWAP) over a 15 day look-back period of time preceding the conversion. Defendants' counsel prepared the various agreements comprising the structured PIPE transaction.   The documents comprising the PIPE Transaction are listed below and are incorporated by reference herein:

o  SECURITIES PURCHASE AGREEMENT
o  SECURED CONVERTIBLE DEBENTURE
o  REGISTRATION RIGHTS AGREEMENT
o  SECURITY AGREEMENT
o  ASSET PLEDGE STATEMENT

- o PLEDGE AND ESCROW AGREEMENT
- o IRREVOCABLE TRANSFER AGENT INST.
- o LOCK UP AGREEMENT
- o WARRANT NO. CLSC-1-A
- o WARRANT NO. CLSC-1-B
- o WARRANT NO. CLSC-1-C
- o WARRANT NO. CLSC-1-D

These document are sometimes referred to collectively herein as the "Transaction Documents."

37.    Pursuant to the terms of the Transaction documents, Defendant Yorkville Advisors, received a fee based on 10% of the transaction value plus some "legal fees" amounting to total fees of $415,000.

**D.    Defendants Abuse The Rights Under The Contracts
And Execute Their Pre-Planned Fraudulent Scheme**

38.    At the time of the structured PIPE transaction closing on December 20, 2006, Cobalis had issued and outstanding approximately 36,000,000 shares of common stock, of which 8,400,000 shares were owned by Plaintiffs. Plaintiffs' shares were required by YAGI to be pledged to YAGI as additional collateral for the loans in the Transaction as a condition of obtaining the financing. Plaintiffs were holding the stock for the long-term, and had just converted $5,200,000 in debt owed by Cobalis to Plaintiffs, the Radovich family, for just under 4,000,000 shares based upon the then market value of the stock. No Radovich family controlled shares were sold in the open market.

39.    When the Securities Purchase Agreement was executed on December 20, 2006, the share price of Cobalis' stock was valued at $0.75 per share at closing. Upon information and belief, at no time *prior* to December 20, 2006, did YAGI, or any of its/their affiliates or agents own any of Cobalis' shares. Upon information and belief, at no time *subsequent* to December 20, 2006, did YAGI, or any of their affiliates or agents *purchase* any of Cobalis shares, from any entity, other than under the terms of the Securities Purchase Agreement, Debenture Agreement

and "A" Warrants.  Upon information and belief, at no time *prior* to December 20, 2006 did YAGI, or any of their affiliates or agents sell shares of Cobalis' stock.

40.   It was never disclosed to Plaintiffs that the true purpose of having Plaintiffs' pledge their shares was to enable YAGI to "cover" its short sales of Cobalis, which began in or about April 2007.

41.   Cobalis, under the terms of the Debentures, had the right, *at any time* after the initial registration of YAGI's free-trading shares in or about April 2007, to redeem same, partially or entirely, by tendering funds to YAGI plus a premium depending on the price of Cobalis' stock at the time of payment.  By terms of the documents, upon repayment of the Debentures, any and all pledged security would be returned to Cobalis as well at to Plaintiffs.

42.   The Debentures were convertible into shares of Cobalis' common stock determined by dividing the dollar amount being converted **by the lower of** the fixed conversion price of $0.**99 or the market conversion price, defined as 90% of the average of the lowest three daily volume weighted average trading prices per share of the Company's common stock for the fifteen trading days immediately preceding the conversion date**.

43.   Yorkville's senior vice president and managers, Craig Engler and David Andresen, stated numerous times that they would not "hit the bid", offer the stock "on the ask" and never exceed 10% - 20% maximum of the daily volume.   In practical numbers, this meant that Cornell would not sell more than 10,000 – 25,000 shares per week.

44.   Upon information and belief, after the Transaction Documents were executed but before YAGI received its free-trading registered shares in April thru July 2007, YAGI and/or its agents or affiliates sold and/or short sold shares of Cobalis' stock.

45.    Plaintiffs became aware of peculiar trading volume activity and later learned that such volume activity preceded conversions by Defendants.    Plaintiffs also became aware of selling and conversion prior to the public release of the Cobalis clinical trial results in 2007.

46.    Defendants knew that Cobalis was seeking to raise capital to redeem the debentures but thwarted such efforts with their voluminous and concentrated selling of stock and their refusal to cooperate with Cobalis in securing financing from interested parties despite Defendants post-closing agreement with Cobalis.

47.    As set forth above, YAGI converted the Debentures in April through July of 2007 in which the average monthly volume of number of Cobalis shares traded increased by 4 to 10 times the average of the prior three months' trading volume.

48.    No registered, free trading shares of Cobalis was issued by the Transfer Agent to YAGI until April of 2007.

49.    Plaintiffs are informed and believe and based thereon alleges that Defendants, including their respective affiliates or brokers acting on behalf of defendants or at their instance and request, accumulated the following shares of Cobalis' common stock through conversions, with such accumulation being primarily for purposes of covering short sales of Cobalis' common stock made in advance of receipt of certificate from conversion:

| Date | Certificate # | $ Amount | # of Shares | Price Per Share |
|------|---------------|----------|-------------|-----------------|
| 3/23/07 | 9448 | $25,000 | 33,025 | $0.76 |
| 4/10/07 | 9466 | 25,000 | 36,539 | 0.68 |
| 4/12/07 | 9467 | 500,000 | 730,780 | 0.68 |
| 4/24/07 | 9499 | 999,999 | 1,333,333 | 0.75 |
| 7/13/07 | 9544 | 170,000 | 1,524,664 | 0.11 |
| 7/19/07 |  | 195,000 | 1,748,879 | 0.11 |

| | | | | |
|---|---|---|---|---|
| 9/27/07 | | 79,809 | 1,505,823 | 0.05 |
| 9/28/07 | | 32,191 | 607,385 | 0.05 |
| 10/16/07 | 9587 | 67,000 | 1,607,143 | 0.04 |
| 1/28/08 | | 13,200 | 498,113 | 0.0265 |
| 3/12/08 | 9635 | 52,500 | 2,375,566 | 0.02 |
| 4/3/08 | 9637 | 60,000 | 2,343,750 | 0.03 |
| 4/18/08 | 9641 | 22,049 | 1,055,000 | 0.02 |
| **TOTAL** | | **$2,241,748** | **15,400,000** | **0.1455** |

50.   Cobalis' stock price at the end of each of the following months, with the total monthly trading volume during said month in set out hereinbelow:

| Month | Close | Trading Volume |
|---|---|---|
| December 2006 | $0.71 | 407,400 |
| January 2007 | 0.74 | 565,100 |
| February 2007 | 1.02 | 1,235,900 |
| March 2007 | 0.80 | 924,000 |
| April 2007 | 1.18 | 3,382,900 |
| May 2007 | 0.72 | 3,712,700 |
| June 2007 | 0.35 | 2,147,600 |
| July 2007 | 0.16 | 8,919,800 |

As demonstrated by the above table, prior to the PIPE transaction with Defendants, Cobalis' share price ranged between approximately $0.70 -- $1.10, and trading volume was approximately 100,000 to 125,000 shares each week. After the structured PIPE transaction with Defendants, when the registered shares became 'free trading' and available to YAGI to convert or cover their short sales, trading volume rapidly increased to approximately 750,000 to 1,000,000 share per week. Because of YAGI's heavily concentrated selling activity in the market – all shares converted or acquired under warrants were sold promptly – there was a constant downward

pressure on the stock price which caused the share price to decrease until it traded at less than 10¢ a share in late July, 2007, and later fell to a penny after YAGI filed an involuntary bankruptcy petition against Cobalis on August 1, 2007.

51.     The rapid increase in the trading volume and dramatic decrease in share price was mainly due to YAGI's steady and heavy short selling and sales of shares acquired through exercise of the  convertible debentures and warrants in the PIPE transaction, in violation of its promises of representations to Plaintiffs that Defendants would not engage direct or indirect short sales, or sell material amounts of Cobalis stock.

52.     The selling, upon information and belief, of large blocks of Cobalis shares by YAGI from April through July 2007, at continually lower prices per share, prevented Cobalis from selling its stock to raise funds to redeem the Debentures which prevented Plaintiffs from obtaining return of their shares.

53.     Sometime during the period, Defendants wrongfully releases the Plaintiffs' Cobalis shares from escrow.

54.     In July 2007, heavy short selling by dealers occurred in advance of the large block sales by YAGI. On July 12, 2007, YAGI sold short 1,774,644 shares before the associated share certificate, with serial number had been issued and well before the shares actually were received in YAGI's trading account at Sloan Securities.  Those shares were sold for $0.22 per share prior to discount and $0.2084 per share as part of a closing ticket selling 1,774,644 shares on July 12, 2007. Given the volatility of Cobalis' share price, particularly after the price was depressed between July 6 and 11, 2007 (in large part in association with large block sales by YAGI), the only way such a large block of shares could have been brokered or sold at a relatively high market price on July 12, 2007, relative to the lower market prices in the prior week and in the

subsequent week was if the dealer had been selling short on YAGI's behalf for some extended period of time beginning well prior to July 2007.  In particular, Knight Trading was actively shorting the common shares of Cobalis as a principal in June and July prior to purchasing 1,774,644 common shares of Cobalis' stock to cover its short position toward the end of trading on July 12, 2007. That 1,774,644 purchase of Cobalis' common shares by Knight Trading exactly matches the accrued short sales by YAGI of Cobalis' common shares on that day.

55.     Similarly, in addition to the short sale on July 12, 2007, YAGI sold shares short in April, 2007, before those shares were received into its account, on April 12, 13 and 17. Defendants had sold more shares than the number of shares it had in its account on April 12, 13, and 17, 2007 and on July 12, 2007. The short position established on July 12, 2007 was not covered until July 23, 2007 – a 'short position' under any terminology or definition of short, (even the T + 3 rule of Regulation SHO).  The trade records for Cobalis' stock, maintained by the OTCBB exchange, reveals significant short selling by dealers in trades in April and July 2007 consistent with the heavy block trading sell orders of YAGI.

56.     On or about August 1, 2007, YAGI filed the involuntary Chapter 7 Petition against Cobalis in this Court.

57.     Defendants' efforts in driving down the value of the stock down to a bare minimum by their short sales eliminated the very real possibility that the company in 2007 was a prime entity for acquisition, due to the promise of the product and the then value of the stock. The acquisition potential was real, and the company could have been acquired by competitors or financiers for amounts in excess of $20,000,000 and thus redeemed the debentures and Plaintiffs stock would have been released from escrow.

58.    The consequence of shorting, hedging and selling large volumes of shares by YAGI was to drive down the price of Cobalis shares from over $1.20 to less than $0.05 in 2007. This dramatic price decline eliminated Cobalis' ability to sell additional shares to the public so that Cobalis could redeem the Convertible Debentures held by YAGI.  In other words, YAGI made it impossible for Cobalis to redeem the debentures, or repay the loans thus allowing YAGI to seize the pledged shares.  By selling massive quantities of Cobalis stock in the short-term – 15 million shares – YAGI destroyed the ability of Cobalis to repay the Convertible Debentures.

59.    As a result of the foregoing Cobalis shares were rendered worthless and Plaintiffs' entire equity position was lost.

## PLAINTIFFS' FIRST CAUSE OF ACTION FOR FRAUDULENTLY INDUCING PLAINTIFFS TO ENTER INTO THE PLEDGE AND ESCROW AGREEMENTS

60.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs as if more fully set forth herein.

61.    Defendants made, or caused to be made to Plaintiffs directly and/or through Plaintiffs' representatives, the representations described herein which Plaintiffs relied upon to their detriment and which induced Plaintiff to enter into the Pledge and Escrow Agreements.

62.    At the time Defendants made or caused these representations to be made, Defendants knew that such representations were false and that YAGI had no intention s or plan to honor those representations.

63.    As a result of those false representations Plaintiffs pledged their Cobalis stock and allowed Defendant Gonzalez to act as Escrow Agent.  Had Plaintiffs known that YAGI's true intention and plan was to profit from the sale of Cobalis stock in the near term, Plaintiffs would not have entered into the Pledge and Escrow Agreements.

64. Absent entering into the Pledge and Escrow Agreements, Plaintiffs could have sold that stock in an orderly fashion to raise money to finance Cobalis operations, thereby obviating the need for Cobalis to enter into the financing transactions with YAGI.

65. But for Defendants misrepresentations, Plaintiffs would not have lost the entire value and possesory interest in their ownership of Cobalis stock.

66. Defendants' misrepresentations and fraudulent inducements were the proximate cause of Plaintiffs' loss and damage.

67. As a result of the foregoing, Plaintiffs are entitled to damages and a judicial declaration that they are not bound by any of the provisions of any of the contract agreement6s and other documents described at paragraph __ herein.

## PLAINTIFFS' SECOND CAUSE OF ACTION FOR BREACH OF FIDUCIARY DUTIES OWED TO PLAINTIFFS BY DEFENDANTS

68. Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs as if more fully set forth at length herein.

69. By virtue of the trust and confidence which Defendants elicited from Plaintiffs and the trust and confidence placed in Defendants by Plaintiffs and as a result of the advisory role voluntarily assured by Defendants with respect to Plaintiffs and as a result of assuring, and insisting upon the role of escrow for Plaintiffs' Cobalis stock, and because Plaintiffs had confided material non-public information to Defendants which Defendants insisted be disclosed, Defendants were at all relevant times fiduciaries with respect to Plaintiffs. Accordingly, Defendants owed Plaintiffs the duties of undivided loyalty, the duty to avoid conflicts between Defendants the duty to make complete and accurate disclosure to Plaintiffs of all information material to the relationship and transactions between/among Plaintiffs and Defendants and the

duty to avoid causing harm to the Plaintiffs and the duty to avoid profiting at the expense of Plaintiffs.

70.     By the acts and omissions described herein, Defendants breached the fiduciary duties they owed to Plaintiffs.

71.     Through their breach of fiduciary duties, Defendants were able to earn profits at the expense of Plaintiffs, which profits should be disgorged to the Plaintiffs.

72.     Through their breach of fiduciary duties, Defendants have caused loss and damage to Plaintiffs.

73.     As a result of the foregoing, Defendants are jointly and severally liable to the Plaintiffs for the disgorgement of profits earned at Plaintiffs' expense and for damages suffered by Plaintiffs.

74.     In addition to the foregoing, at all relevant times mentioned herein, Defendants were in custody and control of an additional 8.4 Million shares of Plaintiff's common stock owned by the Radovich family, which had been transferred to Defendants' attorney, David Gonzalez, Esq. under the Pledge and Escrow Agreement, and Asset Pledge Agreement. The Pledge and Escrow Agreement provides in relevant part, in Section 3, as follows: "Upon the occurrence of an Event of Default (as defined herein), the Collateral Agent [sic David Gonzalez, Esq., attorney for Defendants] shall be entitled to vote the Pledged Shares, receive dividends and other distributions thereon, and enjoy all other rights and privileges incident to the ownership".

75.     In July, 2007, as a result of serving a Notice of Default, Defendants wrongfully were able to seize the 8.4 million shares owned by Plaintiffs.

## PLAINTIFFS' THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS FOR UNFAIR BUSINESS PRACTICES – VIOLATIONS OF CAL. BUS. & PROF CODE § 17200, ET SEQ.

76.    Plaintiff re-alleges and incorporates by this reference each and every allegation of paragraphs 1 through 82, inclusive.

77.    Defendants intentionally engaged in deceptive and unfair business practices, in violation of Cal Bus & Prof Code § 17200, et seq.  Defendants represented to Plaintiff  in writing, and supplemented by oral conversations with Defendant's officers prior to the PIPE Transaction that it would never engage in short sales, hedging operations, acquire own more than 4.99% of Plaintiff's stock, sell more shares in a day, week, or month more than 10-20% of the average trading volume for such periods of time, and that its intention in converting debentures into stock and exercising warrants was to be an shareholder looking toward  future growth Plaintiff's company in harmony with Plaintiff's business purpose of developing  markets for its product.

78.    Defendants also engaged in deceptive and unfair business practices by entering into an agreement with Plaintiff (post closing of the SPA and debenture agreement) that Cobalis would cooperate with, and provide Cobalis, with an opportunity to redeem all outstanding indebtedness owed by Cobalis to Defendants.  Defendants breached this separate agreement by selling Plaintiff's common stock and thereby depressing ins price which deprived Cobalis of any meaningful redemption opportunity.

79.    Defendants knew that its promises and representations concerning its business practices in connection with convertible debentures and warrants obtained in PIPE transactions were false when made, inasmuch as Plaintiff discovered to its chagrin <u>after the PIPE Transaction,</u> that  YAGI, CORNELL, and YA had entered into approximately $762 million in PIPE deals

since 2001, causing the underlying stocks to drop 38% on average in the first year. The PIPE

transactions entered into by YAGI can be fairly described as "designed to fail," as 75% or more

of the 350-plus PIPE transactions entered into by YAGI between 2001 and 2008 were with

public companies that are no longer in business.  These transactions, unknown at their inception

to the publicly traded companies, were *designed to precipitate failure of the business entity with*

*Defendants receiving payment, not in the form of cash payments on debt financing but through*

*concentrated, market disrupting sales of stock converted from debentures, resort to the*

*borrower's collateral, hedging operations and short trading, all of which practices have brought*

*scrutiny to PIPE transactions by the United States Securities and Exchange Commission.*

80.     Defendants engaged in deceptive and unfair business practices and broke its

promises and breached its agreements by converting debentures and promptly selling large

quantities of Plaintiff's stock, greatly in excess of average trading volumes, short selling,

hedging operations, accumulating ownership of more than 5% of Plaintiff's stock, and

manipulating the issuance of shares under the Pledge and Escrow Agreement and Irrevocable

Instruction to Stock Transfer Agent so as to delay delivery of share certificates and create

downward pressure on Plaintiff's stock which had been pre-sold by Defendants.

81.     As a proximate cause of Defendants' unfair business practices, Plaintiff has

suffered damages in an amount to be determined by the trier of fact.

## PLAINTIFFS' FOURTH CAUSE OF ACTION
## FOR FRAUD AGAINST ALL DEFENDANTS

82.     Plaintiffs repeat and reallege each and every allegation of the preceding

paragraphs as if more fully set forth herein.

83. Defendants made the representations alleged herein to Plaintiffs knowing that such representations were false in that Defendants had no intention of honoring their representations to Plaintiffs.

84. Defendants made the representations to Plaintiffs with the intent that Plaintiffs would rely thereon and pledge there Cobalis stock.

85. Defendants sought such pledges from Plaintiffs in order to advance their plan to profit from selling and/or selling short Cobalis stock.

86. Plaintiffs did rely upon the Defendants' representations and in reliance thereon pledged their stock in accordance with the instruments described herein.

87. Contrary to all prior representation, Defendants sold and/or sold short the stock of Cobalis and thereby caused the decline of Cobalis stock price.

88. Finally, Defendants fraudulently seized Plaintiffs stock.

89. Had Defendants not fraudulently induced Plaintiffs to pledge their stock: (1) Plaintiffs could have sold their stock in an orderly fashion and realized the economic benefits of their stock ownership; (2) Plaintiffs could have used their stock to help improve Cobalis' financial condition.

90. Had Defendants not fraudulently engaged in selling and/or selling short Cobalis stock, Plaintiffs stock would not have suffered the loss in value which it did, eventually becoming worthless.

91. As a result of the foregoing, Plaintiffs' have suffered loss and damage due to Defendants' fraudulent conduct.

## PLAINTIFFS' FIFTH CAUSE OF ACTION FOR BREACH OF CONTRACT
## BY VIRTUE OF BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

92.     Plaintiffs repeat and reallege each and every paragraph  hereinbefore set forth (except paragraphs alleging fraudulent conduct) as if more fully set forth herein.

93.     Plaintiffs and Defendants entered into contractual relation whose terms were reflected in the Transaction Documents.

94.     Each party to the Transaction Documents was contractually obligated to adhere to the common law tenants of good faith and fair dealing with respect to the contractual counterparties including Defendants.

95.     Defendants conduct as alleged herein violated their duties of good faith and fair dealing owed to Plaintiffs.

96.     As a result of the breach alleged herein, Plaintiffs suffered loss and damage to their property interests in Cobalis stock.

97.     By virtue thereof, Defendants are liable to Plaintiffs for the loss of their Cobalis stock.

### JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

WHEREFORE, Plaintiff prays for judgment, as follows:

1.     As to Plaintiffs' First, Second, Third, Fourth and Fifth Cause of Actions for general, compensatory and/or statutory damages;

2.     For exemplary and/or punitive damages in a sum to be determined by the trier of fact;

3.     For reasonable attorneys' fees;

4.     For costs of suit herein incurred;

24

5.     For such other and further relief as the court may deem proper.

Dated: October 25, 2012

SQUITIERI & FEARON, LLP

By:_____
       Olimpio Lee Squitieri
SQUITIERI & FEARON, LLP
2600 Kennedy Boulevard
Suite 1K
Jersey City, New Jersey 07306
Tel:  (201) 200-0900
Fax:  (201) 200-9008

- and -

32 East 57th Street
12th Floor
New York, New York 10022
Tel:  (212) 421-6492
Fax:  (212) 421-6553

**Attorneys for Plaintiffs**